UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHLEEN MARIE THOMAS,

               Plaintiff,                        Civil Action No. 12-14758

        v.                                 District Judge Gershwin A. Drain
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]

Plaintiff Kathleen Marie Thomas appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12, 14). For the reasons set forth below, this Court finds that substantial evidence does not support the Administrative Law Judge's findings that Thomas's impairments were not equal in severity to the Commissioner's listing criteria for spinal disorders and digestive disorders. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Plaintiff was 29 years old when she applied for disability benefits. She is married and has no children. Ms. Thomas has a high school education and attended two years of college. She worked for a short time as a waitress during college, and then for over ten years as a certified respiratory therapist but now claims that neck pain, mental illness, and an inability to concentrate prevent her from working. Ms. Thomas also claims to have epilepsy.

### A. Procedural History

On February 26, 2010, Plaintiff protectively applied for disability insurance benefits asserting that she became unable to work on October 29, 2009.[1]  (Tr. 82.)  The Commissioner initially denied Plaintiff's disability application on July 19, 2010.  (Tr. 94-98.)  Plaintiff then requested an administrative hearing, and on March 30, 2011, she appeared with a non-attorney representative before Administrative Law Judge Patricia S. McKay, who considered her case *de novo*.  (Tr. 7-24.)  In an April 14, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  (*See* Tr. 20.)  The ALJ's decision became the final decision of the Commissioner on August 31, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1-6.)  Plaintiff filed this suit on October 26, 2012.  (Dkt. 1, Compl.)

---

[1]  At the hearing, a question of whether Plaintiff was additionally seeking Title XVI benefits arose.  (Tr. 42-43.)  However, a review of Plaintiff's records revealed that although she filed an application for Title XVI benefits in February 2010, this claim was denied due to excess resources and Plaintiff did not seek review.  As such, the only claim before the ALJ was Plaintiff's application for Title II benefits.  (Tr. 10.)

### B. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

Plaintiff was represented at the administrative hearing by a paralegal from the Legal Aid and Defender's organization. (Tr. 41.) Plaintiff testified to being five foot three inches tall and weighing eighty-eight pounds. (Tr. 46.) She lives with her husband and has no children. (*Id*.) She indicated that her house was two levels, but that she slept on the main floor couch because of pain in her neck. (*Id*.)

Plaintiff reported lying on the couch and watching television during the day. (*Id*.) She testified that she did very little cooking, but that she could attend to her personal hygiene. (Tr. 54.) She also indicated that she did minimal housekeeping, limited to wiping down counters and some basic laundry. (Tr. 54.) Plaintiff said that she enjoys reading books, but cannot read online because it hurts her neck. (Tr. 55-56.) Plaintiff noted that she could only read for approximately 15-30 minutes at a time because of her anxiety and short attention span. (Tr. 64.) Plaintiff goes to stores occasionally and socializes with friends approximately one to two times per month. (Tr. 56.)

Plaintiff said that she could lift and carry approximately five pounds. (Tr. 59.) This is partly due to the loss of feeling in her hands. (Tr. 59-60.) Plaintiff also indicated that she could walk about one block. (Tr. 60.) Plaintiff also reported difficulty sitting, and needed to change positions every thirty minutes. (*Id*.) Plaintiff could stand for one to two hours. (*Id*.)

Plaintiff testified to having epilepsy and that her neurologist, Dr. Beall, advised her not to drive as a result. (Tr. 52-53.) Plaintiff indicated that she was restricted from driving for six months from the date of her last seizure. (Tr. 53.) Plaintiff noted that she treated with Dr. Beall only one time, but prior to seeing Dr. Beall she treated with neurologist, Dr. Metkowsky. (Tr. 53-54.)

Plaintiff testified that she had surgery on her neck, but that her pain has persisted after surgery. (Tr. 57.) She indicated that she was not able to continue with physical therapy post-surgery because it was too painful, and she has been "unable to get in to see the doctor after massage therapy." (*Id*.) Despite her attempts with massage therapy, Plaintiff testified that her neck is still in pain. (Tr. 58.)

Plaintiff also reported a history of mental illness, specifically bipolar disorder and depression. (Tr. 58.) Plaintiff noted that she treated with a psychiatrist, Dr. Guyer, and previously with Dr. Matta. (Tr. 64.) Plaintiff testified to several suicide attempts, including an attempt eighteen months ago. (*Id*.)

Plaintiff testified that her medications cause her to be nauseasated, confused, and drowsy. (Tr. 59.) She indicated that her doctors prescribed Compazine in an attempt to alleviate these side-effects. (*Id*.) Plaintiff also testified to having migraine headaches three to four times per week. (Tr. 63.) Her migraines could last anywhere from a couple of hours to a couple of days. (*Id*.)

Plaintiff testified that she is unable to follow instructions and that her attention span has contributed to getting fired from previous jobs. (Tr. 61.) Plaintiff also indicated that she had social anxiety and had difficulty working with previous co-workers. (Tr. 62-63.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience, with an RFC identical to the ultimate determination of Plaintiff's RFC. (Tr. 15, 66-73.) The VE testified that the following jobs were available in Michigan for such an individual:

assembler or packager. (Tr. 71-73.) The VE also testified that the hypothetical individual could also perform assembly and packaging jobs at the sedentary level. (Tr. 73.) The VE also testified that if the hypothetical individual offered testimony identical to Plaintiff's and the ALJ found that testimony to be credible, the individual would not be able to perform any work. (Tr. 74.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors

5

(age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920.  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ McKay found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of October 10, 2009.  (Tr. 12.)  At step two, she found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine and cervical disc herniation with radiculopathy status post C6-7 anterior radical diskectomy, decompression and total discarthoplasty, and history of headaches with mild chronic sinusitis with mucocele/cyst in right maxillary sinus.  (*Id.*)  As to mental impairments, the ALJ determined that Plaintiff had major depressive disorder and bipolar disorder. (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 13.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) except that she is limited to occasional climbing of stairs, crouching, crawling, kneeling, stooping/bending; occasional reaching overhead with the bilateral upper extremities; occasional flexion, extension and rotation of the head/neck; sitting for up to 30 minutes at a time and standing/walking for up to one hour at a time; and she should avoid exposure to work place hazards such as moving machinery, unprotected heights and climbing of ladders. Moreover, the claimant is limited to work that is simple, routine, and repetitive, allows the claimant to control the pace of the work (i.e., avoid a production line work environment), and involves occasional contact with co-workers and the general public.

(Tr. 15.)  At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.

(Tr. 19.)   At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity.  (*Id.*)  The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of her decision.  (Tr. 20.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is

limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff asserts four claims of error: (1) the ALJ erred at Step Three in determining that she did not meet or equal Listing 1.04, Disorders of the Spine; (2) the ALJ erred at Step Three in determining that she did not meet or equal Listing 5.08, Digestive Disorders; (3) the ALJ improperly weighed the opinions of Plaintiff's treating physicians which, in turn, gave rise to an inaccurate Residual Functional Capacity assessment; and (4) the ALJ erred in finding that Plaintiff is capable of making a successful adjustment to other work that exists in the national economy as that finding is not based on the vocational expert's actual testimony. (Pl.'s Mot. Summ. J. at 5-20.)

### A. Step Three Errors

Plaintiff alleges that the ALJ made two significant errors in her Step Three analysis. First, Plaintiff argues that the ALJ erred when she determined that Plaintiff did not meet or equal the listing criteria for Disorders of the Spine (Listing 1.04.). (Pl.'s Mot. Summ. J. at 6-12.) Second, Plaintiff alleges that the ALJ erred when she concluded that Plaintiff did not meet or equal the listing criteria for Digestive Disorders (Listing 5.08.) (Pl.'s Mot. Summ. J. at 12-15.) The Commissioner,

8

on the other hand, contends that the ALJ reasonably found that Plaintiff's impairments did not meet or equal any listings.  (Def.'s Mot. Summ. J. at 9-13.)

At Step Three, the ALJ "must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011).  In *Reynolds*, the Sixth Circuit found that the ALJ erred because "[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe "back pain" impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not."  *Id.*  The Court further concluded that "correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing."  *Id.*  Thus "the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence."  *Id.* at 416.

That is not to say that an ALJ's failure to articulate a Step Three finding may never be deemed harmless.  Where "concrete factual and medical evidence" is "apparent in the record" such that a court can discern how the ALJ "would have" reasoned, the outcome should be affirmed.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656-57 (6th Cir. 2009); *see also M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 860 (E.D. Mich. 2012) (discussing case law).  But in performing this analysis, the Court must exercise caution. The Court may not find the ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision. *See M.G.*, 861 F. Supp. 2d at 860. In *Rabbers*, the Sixth Circuit warned that it may be

difficult or impossible to determine whether an error is harmless when the record contains "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." 582 F.3d at 657-68. The Court cannot speculate as to how the ALJ might have weighed such evidence. *See M.G.*, 861 F. Supp. 2d at 860-61.

        *1.*    *Disorders of the Spine (Listing 1.04)*

At Step Three, ALJ McKay indicated that she

> considered all of the Listings in connection with the claimant's impairments. More specifically, the claimant's impairment of degenerative disc disease does not meet Listing 1.04 because she does not have one of the listed disorders (herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture resulting in a compromise of the nerve root or spinal cord) in conjunction with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and, in connection with the lumbar spine impairment, also a positive straight leg raising test (sitting and supine).

(Tr. 13.)

Listing 1.04 is for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04. There are three alternative methods of meeting the listing. Plaintiff argues that she could meet the requirements outlined in § 1.04(A): "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* Regarding motor loss, the SSA further provides: "Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.00(E). Comparing these criteria to the medical evidence, as the ALJ should have done, the Court finds that Thomas could have met the requirements of Listing 1.04(A).

Thomas presented evidence of nerve root compression in the medical records from Michigan Neurology Associates.  Specifically, a December 10, 2010 letter from Dr. Syed Moosavi to Plaintiff's primary care physician, Dr. Joseph LaJoie,  stated that an "MRI of [Plaintiff's] cervical spine revealed degenerative changes at C6-C7 with surgery change noticed, C5-CD6 disc herniation, posterolateral to the left and right, C6-C7 disc bulge is still present.  There is some impingement upon the neural foramen, C2-C7.  The C6-C7 disc space is limited by artifact." (Tr. 560.)  And in an earlier November 21, 2010 document, Dr. Moosavi concluded that there was "moderate impingement on the left neural foramen and moderate to severe impingement on the right."  (Tr. 563.)  The Commissioner argues that "impingement" does not necessarily indicate "compression" (Def.'s Mot. Summ. J. at 10), but this Court has held otherwise.  *See, e.g., Roberts v. Comm'r of Soc. Sec.*, 12-14661, 2013 WL 6062018, at *14 (E.D. Mich. Nov. 18, 2013) (equating nerve root impingement with nerve root compression).  The Court finds that Plaintiff's evidence fulfils the first part of Listing 1.04(A).

But the Commissioner argues that even if the record does show nerve root compression, Plaintiff still cannot meet Listing 1.04(A) because there is no record of motor loss accompanied by sensory or reflex loss.  20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 1.04(A) (root compression must

11

be "characterized by . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss.".  Plaintiff, on the other hand, contends that she has spent years dealing with pain, including muscle weakness caused by the degenerative changes in her cervical spine and nerve compression. (Pl.'s Mot. Summ. J. at 8.)  While the Commissioner presents evidence that Plaintiff has intact muscle strength, senses, and reflexes both before and after her neck surgery, Plaintiff presents evidence of treatment for paresthesia, which refers to a burning or prickling sensation that is usually felt in the hands, arms, legs or feet, but can also occur in other parts of the body. (Tr. 405-06.)  Plaintiff specifically points to discharge instructions explaining that paresthesia is often a symptom of underlying neurological disease or traumatic nerve damage.  (Tr. 406.)  Plaintiff's primary care physician, Dr. Lajoie, further restricted Plaintiff from doing certain activities including no reaching, occasional lifting 10 pounds, and never lifting more than 10 pounds, which suggests motor loss with sensory or reflex loss.  (Tr.  554-55.)  Further, Dr. Moosavi, a specialist in pain management, limited Plaintiff to the same lifting restrictions and indicated that she was never to push or pull, and only stand and/or walk for a total or two hours or less in an eight hour day.  (Tr. 555.)  Finally, Dr. Moosavi indicated that physical activities such as "walking, standing, sitting, bending, stooping, moving of extremities will greatly increase pain to such a degree as to cause distraction from tasks or total abandonment of task." (Tr. 558.)  Taken together, Plaintiff has likely not presented enough evidence to equal the Listing; however, this does not end the Step Three inquiry.

When a claimant has a listed impairment but does not meet the criteria, an ALJ can find that the impairment is "medically equivalent" to the listing if the claimant has "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R.

§ 416.926(a). The SSA requires that the "judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."  Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 at *3 (1996)[2]; *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."); *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *4 (E.D. Mich. Sep. 25, 2013) (remanding because there was no expert medical opinion on the issue of equivalence, collecting cases); *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013) (remanding for an expert opinion at step three). SSA guidance provides that a "Disability Determination and Transmittal" form signed by a medical or psychological consultant, a "Psychiatric Review Technique" form, "and various other documents on which medical and psychological consultants may record their findings," can fulfill this requirement to "ensure that this opinion has been obtained at the first two levels of administrative review." *See* SSR 96-6p, 1996 WL 374180 at *3.

The administrative record in this case includes a Disability Determination and Transmittal that refers to a July 8, 2010 Mental RFC assessment completed by Disability Determination Services ("DDS") consultant Rose Moten, Ph.D.  (Tr. 90-91.)  Dr. Moten also completed a Psychiatric

---

[2]   Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 U.S. 870, 873 n.3, 104 S. Ct. 1532, 79 L. Ed. 2d 878 (1984).

Review Technique on July 8, 2010. (Tr. 88.) Dr. Moten's medical specialty is psychology. Dr. Moten indicated on the PRT that she considered the following listings: organic mental disorders (Listing 12.02) and affective disorders (Listing 12.04). (*Id.*) Dr. Moten's opinions cannot support a conclusion that Plaintiff's impairments were not equivalent to Listing 1.04. *Cf. Byerley v. Colvin*, No. 12-CV-91, 2013 WL 2145596, at *11 (N.D. Ind. May 14, 2013) ("Because the psychologist who prepared the form did not consider physical impairments, it cannot be relied on as expert opinion that Plaintiff's combination of physical and mental impairments do not equal a Listing."); *Watson v. Massanari*, No. 00-3621, 2001 WL 1160036, at *14 (E.D. Pa. Sept. 6, 2001) (remanding "so that the ALJ can enlist the services of a medical expert capable of making an equivalency finding as to Plaintiff's impairments in combination," where the expert opinions on equivalence in the record expressly addressed only the claimant's physical impairments).

Defendant does not point to any evidence that the record before the ALJ contained an expert opinion on medical equivalence regarding physical impairments. In this case, the lack of an expert opinion on equivalence with respect to Listing 1.04 is not harmless error because an expert could have found that Thomas's impairments were equivalent to the listing. *See Barnett*, 381 F.3d at 667, 671. The ALJ's finding that the listing was not equaled is therefore not supported by substantial evidence. *See Reynolds*, 424 F. App'x at 416.

### 2. *Digestive Disorders (Listing 5.08)*

Plaintiff also alleges that the ALJ erred at Step 3 when she concluded that Plaintiff did not meet or equal Listing 5.08, Digestive Disorders.

Regarding Listing 5.08, ALJ McKay made the following findings:

> the claimant's representative argued that she met Listing 5.08, weight loss due to any digestive disorder despite continuing treatment as

14

prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period. However, there is no evidence to support that the claimant meets this listing. In fact, the representative was unable to identify any digestive disorder associated with meeting this Listing. Although the undersigned recognizes that the claimant has a low body weight and more than likely a BMI under 17.50, there is no indication that this is caused or in any way related to a digestive disorder as required by Listing 5.08.

(Tr. 13.)

Listing 5.00 (Bowel Systems) states in relevant part:

A. What kinds of disorders do we consider in the digestive system? Disorders of the digestive system include gastrointestinal hemorrhage, hepatic (liver) dysfunction, inflammatory bowel disease, short bowel syndrome, and malnutrition. They may also lead to complications, such as obstruction, or be accompanied by manifestations in other body systems.

B. What documentation do we need? We need a record of your medical evidence, including clinical and laboratory findings. The documentation should include appropriate medically acceptable imaging studies and reports of endoscopy, operations, and pathology, as appropriate to each listing, to document the severity and duration of your digestive disorder. Medically acceptable imaging includes, but is not limited to, x-ray imaging, sonography, computerized axial tomography (CAT scan), magnetic resonance imaging (MRI), and radionuclide scans. Appropriate means that the technique used is the proper one to support the evaluation and diagnosis of the disorder. The findings required by these listings must occur within the period we are considering in connection with your application or continuing disability review.

C. How do we consider the effects of treatment?

. . .

6. If you have not received ongoing treatment or have not had an ongoing relationship with the medical community despite the existence of a severe impairment(s), we will evaluate the severity and duration of your digestive impairment on the basis of the current medical and other evidence in your case record. If you

15

have not received treatment, you may not be able to show an impairment that meets the criteria of one of the digestive system listings, but your digestive impairment may medically equal a listing or be disabling based on consideration of your residual functional capacity, age, education, and work experience.

. . .

5.08    Weight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6–month period.

20 C.F.R. Pt. 404, Subpart P, Appendix 1, at §§5.00(A), (B), (C)(6), 5.08.

Plaintiff points to the ALJ's opinion where ALJ McKay recognizes that Plaintiff " . . . also suffers from non-severe impairments . . . as well as gastroesophageal reflux disease." (Tr. 13.)  The ALJ also concedes that Plaintiff's body weight is low and "more than likely a BMI under 17.50." (*Id*.)  Plaintiff catalogues her body weights from June 15, 2010, until February 16, 2011, indicating a weight range from a low of 84 pounds to a high of 95 pounds.  And, during this same period, her BMI scores ranged from a low of 15.4 to 16.8.  (Pl.'s Mot. Summ. J. at 14; Tr. 383, 568, 559, 413-16, 554.)  Plaintiff argues that her gastroesophageal reflux disease has more than just a minimal effect on her ability to perform basic work activities, and therefore should be deemed severe. Plaintiff points to several references in the record regarding nausea and vomiting. (Tr. 425, 540.) Plaintiff also testified that she feels weak and unable to perform activities of daily living as a result of the reflux.  (Tr. 59.)  The Commissioner contends that although the ALJ recognized Plaintiff's history of reflux disease, there was no evidence that Plaintiff's weight loss was connected with that condition.  (Def.'s Mot. Summ. J. at 12.)  Additionally, while the ALJ recognized Plaintiff's low BMI, there was no link between Plaintiff's low BMI and any digestive disorder.  (*Id*. at 13.)

16

As with Listing 1.04, Defendant does not point to any evidence that the record before the ALJ contained an expert opinion on medical equivalence on Listing 5.08. In this case, the lack of an expert opinion on equivalence with respect to Listing 5.08 is not harmless error because an expert could have found that Thomas's impairments were equivalent to the listing, and the ALJ's failure to consult an expert witness was not harmless. *See Barnett*, 381 F.3d at 667, 671. Significantly, the ALJ recognized Plaintiff's reflux disease and her chronically low weight and BMI. Furthermore, the regulations specifically require a finding on medical equivalence in a case where there has been no medical treatment for the ongoing digestive condition. *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 1, at § 5.00(C)(6). For all of these reasons, the ALJ's finding that the listing was not equaled is therefore not supported by substantial evidence. *See Reynolds*, 424 F. App'x at 416.

### B. Weighing the Medical Opinions

As noted above, while this Court ultimately recommends a remand for a medical finding on equivalence at Step 3, it will nevertheless address Plaintiff's secondary argument, namely whether the ALJ improperly weighed Plaintiff's treating doctor's opinions which she alleges caused the ALJ to issue an RFC that did not accurately portray her actual abilities. (Pl.'s Mot. Summ. J. at 15-18.) Indeed, the question of whether the ALJ erred in weighing the medical opinions is not dependent on whether the ALJ erred at Step 3.

Plaintiff contends that had the ALJ given proper weight to Drs. Moosavi, Beall, Lajoie, and Guyer's opinions, the ALJ would have concluded that Plaintiff was disabled and could not perform even light work. (*Id*. at 18.) The Commissioner contends that the RFC determination reflects that the ALJ considered all of the record evidence and assessed Plaintiff with significant limitations that accommodated her impairments. (Def.'s Mot. Summ. J. at 13-20.)

17

The ALJ included significant accommodations in her RFC determination that were largely consistent with the opinions of Drs. Moosavi, Beall, Lajoie, and Guyer.  The ALJ concluded that Plaintiff had the capacity to

> perform light work as defined in 20 CFR 404.1567(b) except that she is limited to occasional climbing of stairs, crouching, crawling, kneeling, stooping/bending; occasional reaching overhead with the bilateral upper extremities; occasional flexion, extension and rotation of the head/neck; sitting for up to 30 minutes at a time and standing/walking for up to one hour at a time; and she should avoid exposure to work place hazards such as moving machinery, unprotected heights and climbing of ladders. Moreover, the claimant is limited to work that is simple, routine, and repetitive, allows the claimant to control the pace of the work (i.e., avoid a production line work environment), and involves occasional contact with co-workers and the general public.

(Tr. 15.)  The ALJ restricted Plaintiff to "light work" which the regulations define as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm and leg controls."  (Tr. 15.)  *See* 20 C.F.R. § 404.1567(b).   The ALJ further limited Plaintiff to sitting for only 30 minutes at a time and standing and walking for up to one hour at a time.  (Tr. 15.)

Dr. Beall's opinion that Plaintiff could frequently lift and carry 10 pounds was consistent with these limitations.  (Tr. 574.)  Moreover, Dr. Lajoie identified no limitations in Plaintiff's ability to stand or walk, Dr. Moosavi identified no limitations in Plaintiff's ability to sit, and Dr. Beall identified no limitations in Plaintiff's ability to stand, walk, or sit.  (Tr. 414, 555, 574.)  The ALJ accommodated Dr. Lajoie's restriction on repetitive reaching by limiting Plaintiff to only occasional overhead reaching.  (Tr. 15, 414.)  Dr. Lajoie identified no other restrictions on repetitive actions, and Dr. Beall identified no restrictions on repetitive actions.  (Tr. 414, 574.)  Moreover, the ALJ went beyond the restrictions set by Plaintiff's physicians, including numerous postural restrictions

18

and restrictions on exposure to workplace hazards. (Tr. 15.) Finally, the ALJ reasonably accommodated Plaintiff's mental limitations that Drs. Lajoie, Beall, and Guyer identified by limiting Plaintiff to simple, routine, and repetitive work with no production line pace and only occasional contact with co-workers and the public. (Tr. 15, 414, 570-574.)

It appears that the only restrictions that the ALJ did not directly incorporate into the RFC were (1) Dr. Lajoie's finding that Plaintiff could sit for less than 2 hours in an 8-hour day; and (2) Dr. Moosavi's finding that Plaintiff could not perform repetitive pushing and pulling with her hands and arms. (Tr. 414, 555.) But, Dr. Lajoie's finding regarding Plaintiff's ability to sit was inconsistent with the findings of both Drs. Moosavi and Beall, and SSR 96-9p specifically states that a limited ability to push and pull generally has little effect on the occupational base for sedentary work. (Tr. 414, 555, 574.) *See* SSR 96-9p at *6.

Under the treating-source rule, the opinions of a claimant's treating physicians are generally given more weight than those of non-treating physicians because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In fact, if the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," then an ALJ must give the opinion "controlling" weight. 20 C.F.R. §§ 404.1527(c)(2) 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. And when an ALJ does not accord the treating physician's opinion controlling weight, he must consider the non-exhaustive list of factors set forth

at 20 C.F.R. §§ 404.1527(c), 416.927(c) to determine how much weight to assign the opinion. *Rogers*, 486 F.3d at 242; *accord Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

The Commissioner notes, and this Court agrees, that Plaintiff did not argue that any of the medical opinions are entitled to controlling weight. Therefore, Plaintiff has forfeited that argument. (Def.'s Mot. Summ. J. at 14 n.8.)   But, the treating-source rule also includes a procedural requirement that an ALJ provide "good reasons" for the weight she assigns a treating-source opinion. *See e.g., Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. There are three reasons for this explanatory requirement: (1) "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied," (2) to "ensure[] that the ALJ applies the treating physician rule," and (3) to "permit[] meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. This procedural right is substantial: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

The ALJ reasonably gave little weight to Dr. Moosavi's opinion because she said Dr. Moosavi had only treated Plaintiff for two months prior to completing the functional capacity assessment. (Tr. 17.)  Pursuant to 20 C.F.R. § 404.1527(c)(2), it is proper for an ALJ to discount a physician's opinion based on the length, nature, and extent of the treatment relationship.  Plaintiff does not specify why she believes that the ALJ erred in discounting Dr. Moosavi's opinion except

to say that Dr. Moosavi based his opinions on an MRI of her cervical spine. (Pl.'s Mot. Summ. J. at 16.) To the contrary, Dr. Moosavi based his findings on a reduced range of motion in Plaintiff's neck and shoulder. (Tr. 555.) Neither Dr. Moosavi nor Plaintiff explain how a reduced range of motion supports Dr. Moosavi's restrictions. The supportability of a medical source opinion, including the amount of relevant evidence cited and the degree of explanation given is a proper reason for an ALJ to discount a physician's opinion. *See* 20 C.F.R. § 404.1527(c)(3). For these reasons the Court concludes that the ALJ did not err in weighing Dr. Moosavi's opinion.

The ALJ reasonably gave no weight to Dr. Beall's testimony because she said it was not supported by record evidence and because Dr. Beall completed his assessment after his first meeting with Plaintiff. (Tr. 17-18.) The ALJ indicated that she was discounting Dr. Beall's opinion because of the "length of the relationship," the "nature and extent of the treatment relationship," the "supportability" of the opinion, and the "consistency" of the opinion with the record as a whole. (Tr. 17-18.) These are all valid reasons to discount an opinion under the regulations. 20 C.F.R. §§ 404.1527(c)(2)-(4). Importantly, Dr. Beall was not a treating physician at the time he completed his assessment (*see* Tr. 573) as one visit does not forge the requisite longitudinal relationship. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."); *see also* 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources ... are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examinations, such as

21

consultative examinations or brief hospitalizations." (emphasis added)). Plaintiff may have developed a treating relationship with Dr. Beall at a later time, but when Dr. Beall issued his opinion that relationship was not yet established. As such, the Court does not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not crediting his opinion. 482 F.3d at 876.

The ALJ gave moderate weight to Dr. Lajoie's opinion regarding Plaintiff's mental limitations because it was consistent with Plaintiff's therapy records. (Tr. 18.) This implicates the "supportability" and "consistency" prongs of the regulation. *See* C.F.R. §§ 404.1527(c)(3)-(4). Plaintiff, however, suggests that the Commissioner "disregarded" the remainder of Dr. Lajoie's opinion. (Pl.'s Mot. Summ. J. at 16.) To the contrary, the RFC provides accommodations that are largely consistent with the physical limitations that Dr. Lajoie identified in his opinion. (*See supra* pp. 16-17.) The fact that the ALJ did not cite specific evidence is not proof that it was not considered. *See Simons v. Barnhard*, 114 F. App'x, 727, 733 (6th Cir. 2004).

Lastly, Plaintiff argues that the ALJ erred in weighing the opinion of Dr. Guyer. (Pl.'s Mot. Summ. J. at 18.) However, Plaintiff misidentifies Dr. Guyer as her psychiatrist at the Biological Psychiatry Center. (*Id.* at 17.) Plaintiff was actually seeing Drs. Mehta and Russell. (Tr. 320-69, 371, 489-90, 492-95, 534-52, 581.) The record shows that Plaintiff did not begin treating with Dr. Guyer until February 2011. (Tr. 581.) Moreover, the record contains only one evaluation prior to Dr. Guyer's March 1, 2011 opinion. (*Id.*) As such, Dr. Guyer cannot be considered a treating source. *See Kornecky*, 1767 F. App'x at 506 n.10. Plaintiff complains that Dr. Guyer assessed her GAF[3] score between 20 and 55, but the record shows that he assessed her GAF score between 35

---

[3] A Global Assessment of Functioning ("GAF") score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 30-34 (4th ed ., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of

and 40 at the initial examination. (Tr. 582.) Furthermore, the Biological Psychiatry Center records contain GAF scores no lower than 40 over a four-year period, with scores primarily falling in the 50-60 range.[4] (Tr. 320-31, 336-38, 341-42, 344-46, 348-50, 352-55, 357-58, 360-62, 364-67, 369, 492-95, 534-52). Despite all of this, the ALJ gave "some weight" to Dr. Guyer's opinion that Plaintiff had marked restrictions in several functional areas. (Tr. 18.) As noted above, because Dr. Guyer was not a treating source the Court does not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not fully crediting his opinion.

## C.    Vocational Expert

Plaintiff's Step Five challenge essentially argues that the ALJ's RFC determination is not based on substantial evidence because the vocational expert testified, in response to one of the ALJ's hypothetical questions, that Plaintiff is unable to work. (Pl.'s Mot. Summ. J. at 19.) But that hypothetical was based on Plaintiff's testimony about her limitations; thus for substantial evidence to support the VE's conclusion, the ALJ must have additionally concluded that Plaintiff's testimony regarding her limitations was credible. (Tr. 74.) Regardless, the Court need not reach this issue because the Court is recommending a remand for a Step Two opinion on the equivalency of Listings 1.04 and 5.08.

---

severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

[4] A GAF score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that substantial evidence does not support the Administrative Law Judge's findings that Thomas's impairments were not equal in severity to the Commissioner's listing criteria for spinal disorders and digestive disorders.  The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the

response.  E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson
Laurie J. Michelson
United States Magistrate Judge

Dated: January 24, 2014

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on January 24, 2014.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson